1

2

3

4

5

JDN

6                **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

9    Kirk Poeppe,                              No. CV 18-01828-PHX-JJT (DMF)

10                        Plaintiff,

11   v.                                        **ORDER**

12   Corizon Health Services LLC, *et al.*,

13                        Defendants.

14

15          Plaintiff Kirk Poeppe brought this pro se civil rights Complaint under 42 U.S.C.

16   § 1983 against Corizon Health Services LLC (Corizon); three Corizon employees—Nurse

17   Practitioners (NP) Lawrence Ende and Jane Frances Ndemanu, and Nurse Mia Myers; and

18   Arizona Department of Corrections (ADC) Director Charles Ryan. (Docs. 1, 64.) Before

19   the Court are Corizon, Ende, Ndemanu, and Myers's Motion for Summary Judgment

20   (Doc. 57), and Plaintiff's Motion to Report Intentional Action (Doc. 94) and Motion for

21   Blatant Contemptuous Actions (Doc. 117).[1] The Court will grant in part and deny in part

22   Defendants' Motion for Summary Judgment and deny Plaintiff's Motions as moot.

23   **I.      Background**

24          Plaintiff's claims arose during his confinement in the Arizona State Prison Complex

25   (ASPC)-Lewis, Buckeye Unit. (Doc. 1 at 1.)[2] In his Complaint, Plaintiff set forth Eighth

26   _____

27          [1] Also before the Court is a Motion for Summary Judgment filed by Ryan, which
     will be addressed separately. (Docs. 123, 127.)
28

           [2] Plaintiff was released from prison in September 2019. (*See* Doc. 115.)

Amendment medical care claims against Defendants based on their alleged failure to provide constitutionally adequate medical treatment for Plaintiff's hydrocele (Count One) and Parkinson's disease (Count Two). (*Id.*)[3] Plaintiff sought injunctive relief and damages. (*Id.* at 5.)

Defendants move for summary judgment on the grounds that (1) neither Nurse Myers, NP Ende, nor NP Ndemanu were deliberately indifferent to Plaintiff's medical needs; (2) there is no evidence that Corizon or its agents were deliberately indifferent to Plaintiff's medical needs; and (3) there is no showing that Plaintiff was deprived of a constitutional right as a result of any deliberately indifferent policy. (Doc. 57.)[4]

On August 22, 2019, shortly after the Motion for Summary Judgment was fully briefed, Plaintiff filed his "Motion to Report Intentional Action to Cause Emotional and Physical Pain." (Doc. 94.) He alleged that NP DeMello was not prescribing pain medication as directed by the treating neurologist and that she threatened to take away a wheelchair that had just been prescribed to him. (*Id.* at 2–3.) Plaintiff requested that the Court stop NP DeMello's conduct. (*Id.* at 3.) Plaintiff then filed his Motion for Blatant Contemptuous Actions, in which he alleged that nurses were not administering the proper dose of his pain medication, and that he had not been provided with a prescribed ankle brace. (Doc. 117 at 1–2.) Plaintiff requested that the Court grant other pending preliminary injunctive relief motions and find Defendants in contempt. (*Id.* at 3.)

## II.   Plaintiff's Motions

Since filing his two Motions, Plaintiff has been released from prison. (*See* Doc. 115.) Therefore, his requests for injunctive relief related to the provision of medical care in the prison are moot. *See Alvarez v. Hill*, 667 F.3d 1061, 1063–64 (9th Cir. 2012)

---

[3] "A hydrocele (HI-droe-seel) is a type of swelling in the scrotum that occurs when fluid collects in the thin sheath surrounding a testicle." *Mayo Clinic Hydrocele*, https://www.mayoclinic.org/diseases-conditions/hydrocele/symptoms-causes/syc-20363969 (last visited March 6, 2020).

[4] Upon the filing of Defendants' Motion for Summary Judgment, the Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Plaintiff of the summary judgment requirements under Federal Rule of Civil Procedure 56. (Doc. 59.)

(former prisoner's declaratory and injunctive relief claims moot following release from custody); *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) ("[a]n inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action") (citing *Preiser v. Newkirk*, 422 U.S. 395, 402–03 (1975)). Moreover, Plaintiff's request to add NP DeMello as a defendant in this action was denied, and Plaintiff's request for the Court to find Defendants in contempt for failing to comply with Court Orders has been addressed by the Court and a hearing has been held. (*See* Doc. 102, 121, 134.) For these reasons, Plaintiff's Motions will be denied as moot.

### III.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v.*

1  *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ.
2  P. 56(c)(1).

3      At summary judgment, the judge's function is not to weigh the evidence and
4  determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,
5  477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must
6  believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at
7  255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need
8  consider only the cited materials, but it may consider any other materials in the record. Fed.
9  R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as
10  evidence in opposition to summary judgment all of the pro se litigant's contentions that are
11  based on personal knowledge and that are set forth in verified pleadings and motions. *Jones*
12  *v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454,
13  460 (9th Cir. 1995).

14  **IV.  Defendants' Procedural and Evidentiary Arguments**

15      In their Reply, Defendants argue that Plaintiff's Controverting Statement of Facts
16  fails to comply with Local Rule of Civil Procedure 56.1(b) because Plaintiff failed to
17  indicate whether he disputed or agreed with each fact set forth in Defendants' Statement of
18  Facts; he failed to provide appropriate citations to the record; and he failed to provide a
19  separate statement of numbered paragraphs in support of his Response. (Doc. 80 at 2.)
20  Defendants contend that Plaintiff failed to cite to any evidence to rebut their claims and
21  that his Response is "a jumble of conclusory statements" and unsupported factual
22  allegations. (*Id.* at 4.) Defendants submit that, due to these procedural and evidentiary
23  deficiencies, summary judgment in their favor is appropriate. (*Id.*) Defendants further
24  contend that Plaintiff failed to submit any of his own evidence as directed in the Court's
25  *Rand* Notice, and that Plaintiff's proffered Affidavit to verify his Response and
26  Controverting Statement of Facts is insufficient. (*Id.* at 4–5.) According to Defendants,
27  Plaintiff's statements are therefore unsworn and must be not be considered by the Court.
28  (*Id.* at 5.)

1    Under Local Rule 56.1(b), the party opposing a summary judgment motion must

2    file a separate statement of facts that sets forth, for each of the movant's statements of facts,

3    a correspondingly numbered paragraph indicating whether the nonmovant disputes the

4    statement in each paragraph and a reference to the admissible evidence in the record that

5    supports that nonmovant's position if a statement is disputed. Under Federal Rule of Civil

6    Procedure 56(e)(2), if the nonmovant fails to properly address a movant's assertion of fact

7    by citing to a particular part of the record, a court may consider the fact undisputed. Thus,

8    even if Plaintiff's Controverting Statement of Facts was deficient—indeed, even if Plaintiff

9    failed to file any controverting statement of facts—it would only result in the Court

10    considering Defendants' facts that are properly supported to be undisputed. *See* Fed. R.

11    Civ. P. 56(c)(a)(A). Such a deficiency is not grounds, by itself, to grant summary judgment.

12    Regardless, the Court finds that Plaintiff's Controverting Statement of Facts is not

13    deficient. His Controverting Statement of Facts sets forth numbered paragraphs

14    corresponding to each of the 60 paragraphs set forth in Defendants' Statement of Facts.

15    (Doc. 70.) *See* LRCiv 56.1(b). In some of his corresponding numbered paragraphs, Plaintiff

16    wrote "no comment" or wrote nothing at all, indicating that he did not dispute the asserted

17    fact set forth in Defendants' subject paragraph. (*See, e.g.*, *id.* ¶¶ 5–6, 10, 12–13, 16, 21, 26,

18    57–60.) In other corresponding numbered paragraphs, Plaintiff set forth a factual assertion

19    and cited to an Exhibit in the record in support of his assertion. (*See, e.g.*, *id.* ¶¶ 4, 9, 14,

20    16, 35, 40, 51, 54.) The Exhibits to which Plaintiff cited are the medical records submitted

21    by Defendants in support of their Motion. (*See id.*) Contrary to Defendants' implication,

22    there is no requirement that Plaintiff must submit his own, separate documentary evidence

23    and that he cannot rely on and cite to documents already in the record; Rule 56 only requires

24    Plaintiff to cite to the particular parts of materials in the record, which he did. Fed. R. Civ.

25    P. 56(c)(1)(A).

26    In a few of his corresponding numbered paragraphs, Plaintiff set forth a factual

27    assertion for which he has personal knowledge; for example, as to what transpired during

28    a medical encounter. (*See, e.g.*, Doc. 70 ¶¶ 3, 7.) In conjunction with his Controverting

Statement of Facts, Plaintiff filed an "Affidavit" in which he states under penalty of perjury that all the information set forth in his Controverting Statement of Facts and his Response is true and correct, and he signed and dated this Affidavit/Declaration. (Doc. 71.) This separate verification complies with the requirements of 28 U.S.C. § 1746, which governs unsworn declarations under penalty of perjury. Accordingly, Plaintiff's Affidavit is sufficient to verify his Controverting Statement of Facts and Response, and the Court considers those factual assertions for which Plaintiff has personal knowledge. *See* Fed. R. Civ. P. 56(c)(4); *Blanas*, 393 F.3d at 923.[5]

Defendants argue generally that Plaintiff's Controverting Statement of Facts is insufficient; however, they do not identify any specific paragraph to which they object. The Court will consider only specific objections to identified paragraphs within the Controverting Statement of Facts. *See Reinlasoder v. City of Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont. Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to permit the Court to rule"); *see also Halebian v. Berv*, 869 F. Supp. 2d 420, 443 n. 24 (S.D. N.Y. 2012) (a court is not obligated to consider an objection entirely lacking in particularity). To the extent that some of Plaintiff's factual assertions are simply legal conclusions, objections are unnecessary and redundant because the Court considers only relevant evidence on summary judgment. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that objections to evidence on the grounds that is argumentative or constitutes improper legal conclusions are "duplicative of the summary judgment standard itself" and are therefore unnecessary).

---

[5] Even if Plaintiff's Controverting Statement of Facts and Response were not verified, the Court would be required to consider those factual assertions that are based on personal knowledge and that could be presented in an admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); *see McAfee v. Metro. Life Inc. Co.*, 368 F. App'x 771, 772 n.1 (9th Cir. March 1, 2010) (the plaintiff's unsworn letter was admissible under Rule 56 "because it was based on personal knowledge, and the contents could be presented in admissible form at trial") (citation omitted); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial . . ."); *see also* Fed. R. Civ. P. 56(c)(2) (a party may object to material presented in opposition to summary judgment *if* that material "cannot be presented in a form that would be admissible in evidence").

1   For the above reasons, Defendants' claim for summary judgment based on alleged

2   procedural or evidentiary deficiencies will be denied.

3   **V.    Relevant Facts**

4   Plaintiff entered ADC custody in 2010, and he was seen by a neurologist for

5   Parkinson's disease in October 2011, at which time he was started on Carbidopa/Levodopa,

6   which is used to treat the symptoms of Parkinson's including shakiness, stiffness, and

7   difficulty moving. (Doc. 69 at 2; Doc. 70, Pl.'s Controverting Statement of Facts ¶ 1;

8   Doc. 58, Ex. J, Ende Decl. ¶ 6; *see* Doc. 58-1 at 12.)[6]

9   On January 25 and 31, 2017, Plaintiff submitted Health Needs Requests (HNRs) for

10  medical care stating that he was in extreme pain. (Doc. 58-1 at 2.)

11  On March 15, 2017, in response to the January 2017 HNRs, Plaintiff saw Nurse

12  Hartsough, who documented that Plaintiff had large, nonreducible inguinal hernias for

13  which he was awaiting surgery; that he had swelling to the scrotum; that he complained of

14  pain and difficulty urinating; and that he had worsening Parkinson's pain and symptoms.

15  (*Id.* at 4.) Nurse Hartsough contacted the Facility Health Administrator to expedite the

16  hernia surgery. (*Id.* at 6.)

17  The next day, March 16, 2017, Plaintiff saw Dr. Itoro Elijah for a chronic care

18  appointment to address Parkinson's, GERD, overactive bladder, and preop for the hernia

19  procedure. (*Id.* at 12.) Dr. Elijah documented that Plaintiff had difficulty with urination and

20  worsening tremors, and Dr. Elijah noted that Plaintiff had not been to a neurologist. (*Id.*)

21  In fact, Plaintiff had not seen a neurologist since the initial October 2011 visit. (Doc. 70

22  ¶ 1.) That same day, Dr. Elijah submitted a consult request for a neurology appointment;

23  in this request, Dr. Elijah asked for a neurologist evaluation to discuss worsening

24  Parkinson's and noted that Plaintiff had notable tremors at rest and he had not seen a

25  neurologist since his diagnosis. (Doc. 58-1 at 18.)

26

27  _____

28  [6] *See* https://corrections.az.gov/public-resources/inmate-datasearch (search by prisoner number for "255681") (last visited March 5, 2020).

The neurology consult request was referred to the Corizon Utilization Management Team for review, and on March 21, 2017, the consult request was denied and an alternative treatment plan (ATP) was issued. (*Id.*)[7]

On March 30, 2017, Dr. Elijah informed Plaintiff that there would be no neurology appointment and that he would be given an alternative treatment plan of stretching exercises. (*Id.* at 21; Doc. 70 ¶ 3.) Dr. Elijah documented in the medical record that they discussed increasing Plaintiff's medication dose, but Plaintiff wanted to wait until after his hernia surgery to re-address tremors and medication changes, and that he thought the tremors were worsening due to stress about his hernia. (Doc. 58-1 at 21, 23.)

On April 3, 2017, Plaintiff underwent hernia surgery at the Chandler Regional Medical Center. (*Id.* at 25.)

On April 6, 2017, Plaintiff saw Dr. Elijah for surgery follow up. (*Id.* at 29.) Plaintiff complained of swelling of the scrotum, and Dr. Elijah informed him the swelling should decrease in time and to elevate his scrotum, and Dr. Elijah noted that staples were to be removed in two weeks. (*Id.* at 29, 31.)

On July 20, 2017, Plaintiff saw NP Ndemanu in response to his request for follow up for his Parkinson's disease. (*Id.* at 33.) Plaintiff reported increased headaches, increased muscle cramping to the right leg, pain in both legs when ambulating, increased tremors, and increased rigidity and stiffness in his hands. (*Id.*) Plaintiff requested insoles. (*Id.*) NP Ndemanu ordered a complete metabolic panel and vitamin B12/folate labs. (*Id.* at 34.) No insoles were provided. (Doc. 70 ¶ 7.)

On September 8, 2017, Plaintiff was seen by Nurse Michael Challand in response to his HNR about swelling and pain to his left testicle. (Doc. 58-1 at 37, 39.) In the medical record for this encounter, the "Plan Notes" were documented as "None." (*Id.* at 40.)

---

[7] In their Statement of Facts, Defendants assert the claimed reason for denial of the consult request and the alternative treatment purportedly recommended; however, the part of the record to which Defendants cite in support of this assertion does not include any of this information. (Doc. 58, Defs.' Statement of Facts ¶ 3, citing Ex. C; Doc. 58-1 at 18–19.) *See* Fed. R. Civ. P. 56(c)(1)(A) (a party asserting a fact must support the assertion by citing to particular parts of the record).

On September 13, 2017, Plaintiff saw NP Ende for a chronic care visit to address Parkinson's and GERD. (*Id.* at 45.) Upon examination, NP Ende noted tremors in the upper extremities. (*Id.* at 46.) NP Ende ordered a diagnostic panel and follow up for Parkinson's in six months. (*Id.* at 48.) NP Ende also examined Plaintiff for his complaints of scrotal swelling since his hernia surgery; Ende observed swelling and a palpable mass from abdomen to groin. (*Id.* at 50.) NP Ende submitted a consult request asking for an ultrasound to assess a mass and swollen scrotum five months post hernia surgery. (*Id.* at 58.) The consult request was referred to the Corizon Utilization Management Team for review, and, on September 19, 2017, it was approved. (*Id.* at 59.)

On October 2, 2017, Plaintiff underwent a scrotal ultrasound, which showed "bilateral large/small left and right unilocular hydroceles," normal testes, and no varicoceles. (*Id.* at 61–62.) Plaintiff's left testicle measured 3.7 x 3.2 x 5.3 cm. (*Id.* at 61.)

On October 24, 2017, Plaintiff submitted an HNR requesting the results of his scrotal ultrasound, to which Myers responded. (Doc. 58, Ex. AA, Myers Decl. ¶ 7.)[8]

On January 26, 2018, Plaintiff saw NP Ende for persistent scrotal swelling since the April 2017 hernia surgery; Plaintiff also reported difficulty with ambulation, limping, and walking sideways. (Doc. 58-1 at 64.) Ende noted that Plaintiff's gait was smooth and his balance was good; that the scrotum was swollen on the left side, but there was no redness or tenderness with palpation; and that the October 2017 ultrasound showed large left hydrocele and small right hydrocele. (*Id.*) In the "Plan Notes," Ende documented that certain medications would be discontinued, and that consults requests would be submitted for urology and neurology. (*Id.* at 66.)

---

[8] Defendants did not submit a copy of the October 24, 2017 HNR. (*See* Doc. 58.) In her declaration, Nurse Myers avers that Plaintiff submitted this HNR, and that in response, she informed Plaintiff that he had been told of the results during a recent provider visit. (Doc. 58, Ex. ZZ, Myers Decl. ¶¶ 6–7.) Defendants did not submit any medical record documenting a provider visit between the October 2, 2017 ultrasound and the date of Plaintiff's HNR. (*See* Doc. 58.) In his Controverting Statement of Facts, Plaintiff did not dispute that he submitted the October 24, 2017 HNR or that Myers responded to it. (Doc. 70 ¶¶ 59–60.) Based on Myer's Declaration statements, it appears that Defendants did not submit all relevant HNRs and medical records.

That same day, NP Ende submitted a consultation request for urology due to Plaintiff's persistent scrotal swelling. (*Id.* at 69.) The request was referred to the Corizon Utilization Management Team for review, and on February 1, 2018, the consult request was denied based on the following:

> Per Dr. Dorsey ATP: Medical necessity not demonstrated. Most hydroceles do not require intervention. Treatment is only indicated in patients who are symptomatic with pain or a pressure sensation or when the scrotal skin integrity is compromised from chronic irritation. For asymptomatic patients with hydroceles, there is no need for routine follow-up.

(*Id.* at 72.)

Also on January 26, 2018, NP Ende submitted a consult request for neurology for diagnosis and treatment of Parkinson's and due to the lack of neurology consultant guidance and Plaintiff's current presentation of ambulation complaints. (*Id.* at 74.) This request was referred to the Corizon Utilization Management Team for review, and on January 31, 2018, the consult request was denied based on the following:

> ATP: the necessity of neurology consult is not demonstrated. Complaints of difficulty ambulating are subjective only, with exam noting smooth gait and good balance. Consider continued onsite management. If the patient has continued complaints, consider thorough neurological and musculoskeletal exam.

(*Id.* at 77.) This Consultation Request Action form setting forth the basis for the consult request denial is time stamped by Nurse Jennifer Garner, and the form does not identify who issued the reason for the denial. (*Id.*)

On February 14, 2018, NP Ende informed Plaintiff of the urology and neurology consult denials and ATPs. (*Id.* at 80–81.)

On February 23, 2018, Plaintiff saw NP Ende for a chronic care appointment to address Parkinson's disease. (*Id.* at 83.) Plaintiff reported swollen scrotum—going on a year now since his hernia surgery—with increased pain up into the lower abdomen, and he expressed concern over never being seen by neurology since his Parkinson's diagnosis, especially now with numbness and tremors to the right foot and shin, difficulty swallowing,

and continued numbness in his right hand. (*Id.*) Ende noted that Plaintiff's gait was smooth and his balance was good, his abdomen was nontender, but his scrotum was "still enlarged to about 9 inches thickened," but "no fluid level noted." (*Id.* at 84.) In the "Plan Notes," Ende wrote "FU CC [follow-up chronic care] Parkinson's disease within 180 days." (*Id.* At 86.)

On March 23, 2018, Plaintiff submitted an HNR stating that in March 2017 he had hernia surgery, that one of his testicles is still swollen very large, and that he had discomfort and pain. (*Id.* at 89.)

On May 1, 2018, Plaintiff saw NP Ndemanu in response to his March 23, 2018 HNR. (*Id.*) Plaintiff reported persistent swelling and pain to the scrotal area and that the swelling and pain had progressed. (*Id.*) Plaintiff reported pain at a 9/10 level. (*Id.*) Plaintiff also reported resting tremors and cramping and history of Parkinsonism (signs and symptoms of Parkinson's disease). (*Id.*) Ndemanu noted that an October 2017 ultrasound revealed a hydrocele, and that the left testes was enlarged, but there was no hernia or signs of infection. (*Id.*) In the "Plan Notes," Ndemanu wrote "continue to monitor" the hydrocele, and, as to the tremors, follow up with labs and continue with medication. (*Id.* at 91.)

On June 18, 2018, Plaintiff initiated this action and filed a Motion for Preliminary Injunction seeking medical treatment. (Docs. 1–2.) He filed an Affidavit averring that by this time, his testicles were enlarged three times their normal size and caused him severe pain and discomfort, which interfered with his daily activities such as walking, sitting, showering, eating, and using the bathroom. (Doc. 4, Pl. Aff. ¶¶ 2, 5.)

On June 29, 2018, Regional Medical Director Dr. Ayodeji Ladele conducted a review of Plaintiff's medical records, and, due to continued scrotal swelling and persistent pain, and the hydrocele diagnosis, he submitted an urgent consult request for an ultrasound of the scrotum to compare the size of the hydrocele since the October 2017 ultrasound. (Doc. 58-1 at 98–99, 104.) This request was referred to the Corizon Utilization Management Team for review, and on July 3, 2018, the consult request was approved. (*Id.* at 104.)

Dr. Ladele also submitted an urgent consult request for a neurology consult based on Plaintiff's medical history of Parkinson's disease, the lack of any neurologist visit, and worsening tremors. (*Id.* at 102.) This request was referred to the Corizon Utilization Management Team for review, and on July 3, 2018, the consult request was approved. (*Id.*)

On July 13, 2018, Plaintiff underwent an ultrasound of the scrotum and testicles; the radiology report stated "moderate left hydrocele formation" and "testicular findings . . . within normal limits." (*Id.* at 107.) Plaintiff's left testicle measured 4.2 x 3.8 x 4.6 cm. (*Id.*)

On July 20, 2018, Plaintiff had labs taken. (Doc. 58-2 at 20.)

On July 27, 2018, Plaintiff saw neurologist Dr. Nirmala Aryal. (Doc. 58-1 at 110.) Dr. Aryal conducted a thorough examination and assessed Parkinson's disease, idiopathic peripheral neuropathy, low back pain, cramps of right lower extremity, and hand cramps. (*Id.* at 111–112.) Dr. Aryal ordered the following treatment: for Parkinson's—continue carbidopa/levodopa and lab tests; and for idiopathic peripheral neuropathy, low back pain, and cramps—begin taking Neurontin (Gabapentin) 300 mg one capsule each night, lab tests, and EMG (electromyography) and NCS (nerve conduction) studies of upper and lower extremities. (*Id.* at 112–113.) Dr. Aryal ordered follow up in one month. (*Id.* at 113.)

On August 6, 2018, NP Ndemanu reviewed Dr. Aryal's medical report and, pursuant to that report, prescribed Gabapentin 300 mg and submitted a consult request for the EMG and NCS studies. (*Id.* at 115, 117; Doc. 58-1 at 2.) The consult request for the EMG and NCS studies was referred to the Corizon Utilization Management Team, and on August 9, 2018, the request was approved. (Doc. 158-2 at 3.)

On August 21, 2018, Plaintiff saw NP Ndemanu for a chronic care visit to address Parkinson's disease. (*Id.* at 5.) Plaintiff reported right leg and hip pain, a shuffling gait, and that he fell about 6 weeks before due to loss of balance. (*Id.*) Ndemanu noted a smooth gait, but she discussed the need for a cane, and Plaintiff did not want a cane at that time. (*Id.* at 7, 12.) Plaintiff also reported that his hydrocele/testicular size remained the same since his hernia surgery, and the medical record appears to note that he reported pain "10/10

most of the time" but does not use scrotal support. (*Id.* at 5.)[9] Due to Plaintiff's reported increase in pain, Ndemanu ordered a hernia aid (scrotal support). (*Id.* at 12; Doc. 58, Ex. U, Ndemanu Decl. ¶ 10.) In the "Plan Notes," Ndemanu documented that Plaintiff was to continue Gabapentin 300 mg and carbidopa/levodopa until next follow up with neurology; follow up in chronic care in 180 days; and continue to monitor the hydrocele. (Doc. 58-2 at 12.)

On August 28, 2018, Plaintiff underwent EMG and NCS/nerve conduction studies of the lower extremities. (*Id.* at 15–18.) From the results, Dr. Aryal confirmed a diagnoses of sensory motor neuropathy bilateral. (*Id.* at 17.)

On September 5, 2018, Plaintiff submitted an HNR stating that he had an ultrasound of his testicle on July 13, 2018, that it had been 6 weeks and he was still in severe pain and believes he needs surgery on the hydrocele, and he asked what was going on? (Doc. 158-2 at 20.) He also wrote that when he saw the neurologist on July 27, 2018, he was told he would return in 30 days for a follow up, so what was going on? And he asked for the results of his July lab tests. (*Id.*)

In response to this HNR, Plaintiff was seen on September 11, 2018 by NP Ndemanu. (*Id.* at 20.) She reviewed with Plaintiff the results of the EMG and NCS studies and the ultrasound findings. (*Id.*) Ndemanu noted that there was no recommendation on the ultrasound report. (*Id.*) Ndemanu documented Plaintiff's reports of increased pain to the left scrotal and bilateral extremities, and he requested an increase in Gabapentin. (*Id.*) In the "Plan Notes," Ndemanu wrote "continue with hernia aid." (*Id.* at 24.)

On October 18, 2018, Plaintiff was seen by Nurse Emily Puckett; he reported difficult ambulation due to Parkinson's, a fall about 3 months before, and that his pain had increased and radiated up his left leg. (*Id.* at 27.) Plaintiff requested a change to the dose

---

[9] The medical record submitted by Defendants is cut off so that the relevant line appears as:

IM [inmate] reports testicular size remains same since 3/2018, r[cut off] 10/10 most of the time, denies use of scrotal support. (Doc. 58-2 at 5.)

and frequency of Gabapentin and stated he needed a hernia repair. (*Id.*) In the "Plan Notes," the nurse wrote "none," but she indicated she would contact the provider. (*Id.* at 32, 34.)

On October 26, 2018, NP Johnson entered an order to increase Plaintiff's Gabapentin 300 mg to twice a day instead of once a day; however, the medical record shows that this order was "Discontinued [ ] other," and Plaintiff asserts that he continued to receive just one dose of Gabapentin each afternoon. (*Id.* at 37, 40; Doc. 70 ¶ 37.)

On November 6, 2018, Regional Medical Director Dr. Ladele submitted a consult request for a urology appointment. (Doc. 58-2 at 43.) In this request, Dr. Ladele wrote that "patient will need urology evaluation for hydrocele. Per court ordered agreement." (*Id.*) He also noted that Plaintiff had a prior ultrasound showing a left hydrocele and chronic epididymitis, and that Plaintiff had increased pain. (*Id.*) This consult request was referred to the Corizon Utilization Management Team for review, and on November 9, 2018, the request was approved. (*Id.* at 44.)

Also on November 6, 2018, a consult request for a neurology appointment was submitted. (*Id.* at 46, 49.)[10]

On December 5, 2018, Plaintiff saw NP Ende; Plaintiff reported chronic lower back pain with radiculopathy down the right leg and worsening tremors. (*Id.* at 52.) Plaintiff was using a walker but requested to use crutches instead. (*Id.*) Ende issued an SNO for crutches, ordered an x-ray of the lumbar spine, and increased Gabapentin to 600 mg twice a day. (*Id.* at 56, 58.)

On December 7, 2018, a lumbar spine x-ray was taken. (*Id.* at 60–61.) The x-ray report stated "1. Multilevel subluxations of the right upper lumbar scoliosis. 2. No acute fractures. 3. Multilevel lumbar degeneration." (*Id.* at 61.)

On December 12, 2018, Plaintiff saw neurologist Dr. Aryal for a 5-month follow up, even though she had ordered a one-month follow up. (*Id.* at 64; Doc. 58-1 at 113.) Dr. Aryal took Plaintiff's history, performed an examination, and reviewed all reports from

---

[10] This neurology consult request is noted in a medical record. (Doc. 158-2 at 46, 49.) Defendants did not submit a copy of the consult request form, so it is unclear who submitted the request.

Plaintiff's previous neurologist and the prison. (Doc. 58-2 at 64–65.) Dr. Aryal assessed Parkinson's disease (primary), idiopathic peripheral neuropathy, low back pain, and right ankle swelling. (*Id.* at 65.) She ordered the following treatment: (1) continue carbidopa/levodopa 25/250 four times a day; (2) start Cymbalta 30 mg once a day in the morning; (3) Gabapentin 600 mg twice a day; (4) an MRI of the lumbar spine; and (5) an x-ray of the right ankle. (*Id.* at 65–66.) Dr. Aryal also noted that Plaintiff was to follow-up in three months. (*Id.* at 66.)

On December 20, 2018, Plaintiff saw Dr. Biren Patel, a urologist. (*Id.* at 69.) Dr. Patel reviewed Plaintiff's present illness, noting that since his March 2017 hernia surgery he had had significant left-sided testicular swelling, enlargement, and testicular pain that is persistent and progressively worsening. (*Id.*) Dr. Patel also noted that in the last months, Plaintiff had two instances of blood from the penis after urination, and that 2 separate scrotal ultrasounds confirmed left-sided hydrocele greater than 6 cm. (*Id.*) Dr. Patel took a thorough review of Plaintiff's history and conducted a physical examination. (*Id.* at 69–71.) Dr. Patel assessed bilateral hydroceles left greater than right and recommended bilateral hydrocelectomy outpatient surgery. (*Id.* at 71.)

On December 24, 2018, Plaintiff had x-rays taken of his right ankle. (*Id.* at 82.) The results showed "1. Old fractures inferior to lateral malleolus. No acute fracture. 2. Indeterminate density dorsal to the ankle on the lateral view, uncertain if this is related to soft tissues or possibly posterior ankle joint loose body but there are no significant degenerative changes seen at the ankle." (*Id.* at 83.)

On December 31, 2018, NP DeMello submitted a consult request for urology for the recommended bilateral hydrocele excision/surgery. (*Id.* at 85.) This consult request was referred to the Corizon Utilization Management Team for review, and on January 22, 2019, the request was approved. (*Id.* at 86.)

On January 2, 2019, Plaintiff was seen in the medical unit by NP DeMello to discuss an alternative treatment plan in lieu of Dr. Aryal's December 12, 2018 order for an MRI of

the lumbar spine. (Doc. 39 at 36.) The consult request for an MRI was denied based on the following:

> ATP per S. Stacy

> ATP: MRI for generalized, nonspecific low back pain is typically not medically necessary. Consider management based on clinical exam findings.

(*Id.*) NP DeMello examined Plaintiff and assessed lumbar spine pain and pain in the right ankle and joints of the right foot. (*Id.* at 36–38.) In the "Plan Notes," DeMello wrote "HEP lumbar spine," which appears to refer to home exercise plan; capsaicin ointment; continue with current medications; and "symptomatic treatment, may continue treatment at home," and she advised Plaintiff to call his correctional officer or go to medical if his symptoms worsen. (*Id.* at 40.)

On February 1, 2019, Plaintiff underwent bilateral hydrocele outpatient surgery, performed by Dr. Patel. (Doc. 58-2 at 88.) There were no complications with the surgery, and the hydrocele sacs that were removed tested negative for malignancy. (*Id.* at 89–90.) That same day, Nurse Myers evaluated Plaintiff upon his return to the facility and found him to be in stable condition. (Doc. 58, Ex. ZZ, Myers Decl. ¶ 4.)[11]

On February 4, 2019, Plaintiff saw NP DeMello; he reported that two drains placed in his testicles during surgery had fallen out. (Doc. 58-2 at 92.) Plaintiff reported that he was feeling much better and pain was minimal, and he refused Tylenol 3 that day, though he was still swollen with lots of bruising. (*Id.*) DeMello gave Plaintiff supplies to do his own dressing changes and instructed him to continue with pain medications as ordered. (*Id.* at 96.) That same day, DeMello submitted an urgent consult request for post-surgery follow up. (*Id.* at 99.) This request was referred to the Corizon Utilization Management Team for review, and on February 7, 2019, the request was approved. (*Id.* at 100.)

---

[11] In her Declaration, Myers avers that she saw Plaintiff on February 1, 2019, upon his return to the prison after surgery, and she indicates that she noted his condition and the discharge orders. (Doc. 58, Ex. ZZ, Myers Decl. ¶ 4.) Defendants did not submit a medical record generated by Myers for this date or documenting Plaintiff's return from surgery. (*See* Doc. 58.) In his Controverting Statement of Facts, Plaintiff does not dispute that Myers saw him when he returned from surgery. (Doc. 70 ¶ 59.) Based on Myer's Declaration statement, it appears that Defendants did not submit all relevant medical records.

On February 14, 2019, Plaintiff returned to Dr. Patel for the urology follow up. (*Id.* at 103.) Dr. Patel found significant swelling to the bilateral hemiscrotum, but that was expected, and there was no evidence of discharge, infection, abscess, or tenderness. (*Id.*) Dr. Patel noted that both drains had been removed, and to expect significant swelling for at least 3-6 months. (*Id.* at 104.)

On March 14, 2019, Plaintiff filed a Motion for Preliminary Injunction seeking an order directing Defendants to follow Dr. Aryal's treatment plan for Parkinson's and her order for an MRI. (Doc. 35.) Plaintiff indicated that he was suffering severe pain in his right side from hip to foot. (*Id.*)

On March 19, 2019, Plaintiff submitted an HNR stating that his foot was numb and turning outward and that he had severe pain from his hip to his ankle. (Doc. 39 at 43.)

On March 26, 2019, Plaintiff saw NP DeMello; Plaintiff reported that when he walks, his right foot turns outward, and that he had right hip pain and pain down his calf to the top of the foot. (Doc. 58-2 at 107.) Plaintiff reported that walking more than 50 feet caused severe hip, ankle, and foot pain and requires him to sit and rest. (*Id.*) Upon examination, DeMello noted radiculopathy reported when palpating the right side, which caused a lightning sensation down Plaintiff's leg, and she noted pain with lumbar flexion, extension, and rotation. (*Id.* at 108.) DeMello diagnosed unspecified inflammatory spondylosis of the lumbar region and lumbago with sciatica (radiating pain from lower back down the leg). (*Id.*) In the "Plan Notes," DeMello wrote "MRI lumbar spine[,] pain management referral for lumbar spine/sacral iliac pain." (*Id.* at 11.) That same day, she submitted a consult request for radiology for an MRI of the lumbar spine. (*Id.* at 114.) The consult request was referred to the Corizon Utilization Management Team for review, and on March 29, 2019, the request was approved. (*Id.* at 115.)

On April 29, 2019, Plaintiff had an MRI of the lumbar spine. (*Id.* at 118.) The MRI radiology report stated the following findings:

> • advanced multilevel degenerative disease of the lumbar spine . . . demonstrating severe right-sided foraminal stenosis at L3-L4, L4-L5, and L5-S1, with compression of the exiting nerve roots at all 3 levels;

· severe left-sided foraminal stenosis at L2-L3 with compression of the exiting left L2 nerve root;

· severe bilateral facet arthropathy at L4-L5 and L5-S1 with grade 1 anterolisthesis at both level; and

· moderate S-shaped scoliosis.

(*Id.* at 119-120.)

On May 1, 2019, the Court entered an Order granting Plaintiff's Motion for Preliminary Injunction and ordering Defendants to promptly schedule Plaintiff to undergo a lumbar MRI and a right ankle x-ray as ordered by Dr. Aryal; promptly schedule Plaintiff to see Dr. Aryal for a follow-up appointment; and provide any treatment, procedures, testing, and/or medications recommended or prescribed by Dr. Aryal at the follow-up appointment. (Doc. 44.)

On May 2, 2019, Regional Medical Director Dr. Ladele submitted a consult request for a neurology follow up. (Doc. 58-2 at 122.) In the consult request, Dr. Ladele noted that Plaintiff had a pending MRI and that x-rays should be performed prior to the follow-up appointment with the neurologist. (*Id.*) This consult request was referred to the Corizon Utilization Management Team for review, and on May 10, 2019, the request was approved. (*Id.* at 123.)

On May 3, 2019, Plaintiff had x-rays of his right ankle. (*Id.* at 124.) The results showed old fracture findings with posterior density present. (*Id.* at 125.)

On June 10, 2019, Plaintiff saw Dr. Aryal for the ordered follow up. (*Id.* at 127.) Dr. Aryal noted that Plaintiff's back is getting worse, he has tingling and numbness in his feet, his right ankle is getting worse, he has trouble walking, but his hands were better, and that he uses a wheelchair most of the time. (*Id.*) Dr. Aryal conducted a thorough exam and assessed Parkinson's, idiopathic peripheral neuropathy, radiculopathy due to lumbar disc disorder, low back pain, and right ankle swelling. (*Id.* at 129.) Dr. Aryal ordered the following: (1) continue Carbidopa/levodopa, (2) stop Cymbalta, (3) change Gabapentin to 600 mg, *2 tablets after dinner* (instead of twice a day), (4) referral to a

surgeon/neurosurgeon for degenerative disc disease/radiculopathy, (5) referral to a podiatrist for ankle management, (6) provide Dr. Aryal with the ankle x-ray report and labs as they are still pending, and (7) follow-up appointment in two months. (*Id.*) Dr. Aryal told Plaintiff she would prescribe a wheelchair to assist in his mobility, and that she would prescribe medical shoes. (Doc. 56 at 1–2.)

On June 14, 2019, NP DeMello submitted consult requests for a neurosurgery consult and a podiatry consult as recommended by Dr. Aryal. (Doc. 58-2 at 132, 134.) Both of these consult requests were referred to the Corizon Utilization Management Team for review. (*Id.* at 133, 135.)

Also on June 14, 2019, Plaintiff submitted an "Urgent" HNR stating that his pain level is getting worse by the day and that the neurologist ordered Gabapentin 600 mg 2x a day, and he asked where his medication was. (Doc. 88-1 at 19–20.) He also asked about the prescribed medical shoes. (*Id.* at 19.)

On June 17, 2019, Plaintiff submitted another HNR, which stated at the top "911 HELP ME!" (*Id.* at 18.) He wrote that he wanted a wheelchair as prescribed by the neurologist and that he had not received his Gabapentin. (*Id.*) He reported that his leg had lost circulation and hurt and was now cold to the touch. (*Id.*)

In response to his HNRs, Plaintiff was seen in the clinic on June 19, 2019, by NP DeMello. (Doc. 88-2 at 54.) Plaintiff reported increased pain at a 10/10 level intermittently, that aching pain wakes him up at night, and that he cannot walk to the bathroom without crutches. (*Id.* at 50.) Plaintiff requested to try Gabapentin as ordered by the neurologist. (*Id.*) Plaintiff acknowledged that in April 2019, he had requested to discontinue Gabapentin due to sedation, fogginess, and concerns about falls, and he discussed with NP DeMello that these are still concerns; however, Plaintiff wanted to try what the neurologist had prescribed. (*Id.*) Plaintiff also requested a wheelchair. (*Id.*) NP DeMello deferred the request for a wheelchair and offered a walker, which Plaintiff refused. (*Id.* at 52.) Because Plaintiff is 6'5," the walker is too small for him and he cannot bend over with his pain, and a walker makes him unstable. (*Id.*; Doc. 83 at 2.) DeMello

said she would order Gabapentin, starting at 600 mg once a day for 14 days and then increase the dose to 1200 mg. (Doc. 88-2 at 52.)

On June 20, 2019, Plaintiff filed a Motion for Preliminary Injunction in which he stated that he had still not received Gabapentin as ordered by Dr. Aryal, nor had he seen a surgeon, and that NP DeMello refused to issue a wheelchair or medical shoes. (Doc. 56.)

On June 24, 2019, an order was submitted for Gabapentin 600 mg, 1 tablet every evening, and this order was received from the pharmacy. (Doc. 88-2 at 44.)

On June 26, 2019, the consult request for a podiatry appointment, submitted on June 14, 2019, was denied by "S. Stacy" for the following reason:

> ATP: Based on information provided, medical necessity not demonstrated at this time. Consider onsite nonsurgical management of the patient's chronic ankle pain.

(Doc. 105 at 22.)

On July 1, 2019, Centurion took over for Corizon as the contracted healthcare provider for ADC.

**VI.    Eighth Amendment**

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep' t*, 865 F.2d 198, 200 (9th Cir. 1989).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## VII.   Individual Capacity Claims

### A.   Serious Medical Need

There is no dispute that Plaintiff's hydrocele and Parkinson's disease, which both required significant medication and treatment, including specialist treatment, constituted serious medical needs.

### B.   Deliberate Indifference

The Court therefore moves directly to the subjective prong—whether the response to Plaintiff's serious medical needs amounted to deliberate indifference. *See Jett*, 439 F.3d at 1096. In assessing liability for deliberate indifference, the Court must take an individualized approach and consider the duties and discretion of each defendant, and whether a defendant "was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

. . . .

1

### 1.      Nurse Myers

Defendants submit that Myers's only interactions with Plaintiff were in October 2017, when she responded to one of Plaintiff's HNRs requesting results of his ultrasound, and she told him he had already been informed of the results, and then on February 1, 2019, upon Plaintiff's return from bilateral hydrocele surgery, when Myers evaluated him and noted that his condition was stable. (Doc. 57 at 13; Doc. 58 ¶¶ 57, 59–60.) Plaintiff asserts that he in fact had numerous interactions with Myers and that she told him to stop submitting HNRs, doctors do not want to see him anymore, and if he continued to submit HNRs, he would be given a disciplinary ticket. (Doc. 69 at 3.) Plaintiff further asserts that Myers dismissed his pain from the hydrocele as "made up," and that she prevented him from seeing a provider on multiple occasions. (Doc. 1 at 3; Doc. 70 ¶ 56.)

The Court must take Plaintiff's facts as true, and those facts may support that Myers purposely failed to respond to Plaintiff's pain or possible medical need. *See Wood*, 900 F.2d at 1334; *McGuckin*, 974 F.3d at 1060 (deliberate indifference established where a defendant "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need"). But the facts related to Myers are sparse, and Plaintiff fails to show or allege that as a result of her conduct, he stopped filing HNRs for medical help. Nor does he provide any specific facts or allegations regarding the occasions when Myers allegedly prevented him from seeing a provider and how he suffered as a result. *See Leer*, 844 F.2d at 634 ("[t]he prisoner must set forth specific facts as to each individual defendant's deliberate indifference"). The medical evidence demonstrates that NPs or physicians ordered treatment, prescribed medication, and submitted consult requests for specialty care; thus, Myers's duties as a nurse were limited. *See id.* at 633. As discussed below, the evidence supports that Plaintiff was harmed as a result of denials and delays of specialist-recommended treatment, but there are no facts or evidence presented to suggest that Myers's conduct in her role as a nurse contributed to those delays or that her actions otherwise caused some direct harm to Plaintiff. Consequently, even assuming, arguendo, that there exists a question of fact as to whether Myers acted with deliberate indifference

in response to Plaintiff's serious medical need, there is an absence of evidence to support that Plaintiff suffered harm as a result of her conduct. Summary judgment will therefore be granted as to the claim against Myers in both Count One and Count Two.

### 2.   NP Ende

The medical evidence shows that NP Ende was involved in Plaintiff's care from September 2017 to December 2018. (Doc. 158, Ex. J, Ende Decl. ¶¶ 7, 14 (Doc. 158-1 at 55–56).) Defendants contend that NP Ende acted appropriately in treating Plaintiff's Parkinson's disease and hydrocele by submitting consult requests for neurology and urology as well as for procedures, including x-rays and an ultrasound. (Doc. 57 at 12–13.) Defendants explain that once Ende submits a consult request, he has no control over whether that request is approved or scheduled. (*Id.* at 12.) Defendants also contend that NP Ende provided proper treatment by increasing Plaintiff's Gabapentin dose, issuing crutches, and maintaining and monitoring Plaintiff's medication for Parkinson's. (*Id.*) Plaintiff asserts that Ende failed to ensure specialist care for Plaintiff's serious medical need when he accepted the consult request denials and ATPs instead of communicating to the Committee the urgent need for specialist care. (Doc. 1 at 3; Doc. 70 ¶¶ 9, 19.) Plaintiff argues that Ende acted with incompetence in determining that despite scrotal swelling, there was no fluid collection. (Doc. 69 at 2.) And Plaintiff states that Ende informed him that despite his worsening Parkinson's symptoms, due to lack of money, they could do nothing more for him. (Doc. 4, Pl. Aff. ¶ 3.)

The medical evidence shows that from September 2017 to January 2018, NP Ende submitted consult requests for an ultrasound and for urology and neurology consults. (Doc. 58-1 at 58, 69, 74.) The urology and neurology consult requests were denied by the Corizon Utilization Management Team, and in his Declaration, Ende avers that he had no control over the approval or denial of consult requests. (Doc. 158, Ex. J, Ende Decl. ¶ 12.) Plaintiff points to no evidence to counter this or show that Ende could have somehow ensured the approval of those requests or overridden Corizon's denials. Also, even assuming that Ende's February 23, 2018 determination that there was no fluid collection despite obvious

scrotal swelling was incorrect or illogical, at most, this single diagnosis failure shows incompetence or negligence, neither of which constitutes deliberate indifference. (Doc. 58-1 at 84.) *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (malpractice or even gross negligence does not rise to deliberate indifference). The medical evidence shows that after the February 23, 2018 appointment, Ende did not see Plaintiff again until December 5, 2018, at which time, in response to Plaintiff's complaints of worsening pain, Ende ordered spine x-rays and crutches and increased the Gabapentin dose. (Doc. 58 at 83; Doc. 58-2 at 52, 56, 58.) Ende's actions in ordering relevant tests to better diagnose Plaintiff's conditions, requesting specialist care, and prescribing increased doses of pain medication demonstrates that he responded to Plaintiff's pain and medical needs. The fact that Ende was unable in his position to override the Corizon Utilization Management Team's decisions to deny specialist care does not transform his conduct into deliberate indifference. Accordingly, the Court will grant summary judgment to NP Ende as to both Counts.

### 3. NP Ndemanu

NP Ndemanu saw Plaintiff on three occasions: May 1, 2018, August 21, 2018; and September 11, 2018. (Doc. 58, Ex. U, Ndemanu Decl. ¶ 5 (Doc. 58-1 at 94.) Defendants argue that there is no evidence that Ndemanu subjectively appreciated a substantial risk of serious harm to Plaintiff at these encounters. (Doc. 57 at 13.) They submit that Ndemanu monitored the hydrocele, saw no evidence it was increasing in size, provided a hernia belt, and determined that Plaintiff was already on medications to manage any associated pain. (*Id.*) Plaintiff asserts Ndemanu's decision to just monitor his condition and do nothing—even though his testicle was triple in size and she saw him multiple times—amounts to deliberate indifference. (Doc. 70 ¶¶ 21–22.) Plaintiff notes that Ndemanu never ordered Gabapentin for him, and he states that the hernia belt/scrotum support was completely ineffective and was akin to placing a band-aid on a bullet wound. (*Id.* ¶ 22; Doc. 69 at 3.)

The initial element in the deliberate indifference analysis is whether the defendant was aware of the plaintiff's serious medical need; therefore, the Court first considers

Defendants' argument that Ndemanu was not subjectively aware of a substantial risk of serious harm to Plaintiff. *See Jett*, 439 F.3d at 1097. As stated, Defendants present no argument that Plaintiff did not have serious medical needs. As the treating provider, NP Ndemanu had access to Plaintiff's medical records that documented his serious medical needs. Moreover, at Ndemanu's first encounter with Plaintiff, Plaintiff informed Ndemanu that he had surgery in March 2017, that since that surgery he has had swelling, that a hydrocele was confirmed in October 2017, that the swelling has progressed and the pain has increased, and that his pain was at a 9/10 level. (Doc. 58-1 at 89.) At the following two encounters, Plaintiff still had swelling, and he informed Ndemanu that his pain was at a 10/10 level, that his pain was severe, and that his pain was increasing. (Doc. 58-2 at 5, 20.) A reasonable jury could find that based on Plaintiff's medical records, his presentation and symptoms, and his reports of severe and worsening pain, NP Ndemanu was subjectively aware of Plaintiff's serious medical need and the risk to his health.

The medical evidence shows that at the May 1, 2018 appointment, Plaintiff presented with very enlarged testicles and reported that the swelling has been persistent and was worsening, and that his pain was at a 9/10 level. (Doc. 58-1 at 89.) NP Ndemanu noted the October 2017 ultrasound finding of a hydrocele, and decided to simply "continue to monitor" based on her opinion that "hydroceles are common after inguinal hernia surgery . . . [and] generally do not pose a serious threat to the patient's health, and usually resolve in time without the need for surgical intervention." (Doc. 58-1 at 89; Doc. 58, Ex. U, Ndemanu Decl. ¶ 6.) By this time, however, Plaintiff was 14 months post hernia surgery and the hydrocele had not resolved, and his pain was severe. Thus, the evidence supports that Plaintiff presented with a hydrocele that did not fall within the general pathology of a hydrocele; yet, Ndemanu provided no treatment at all.

When NP Ndemanu saw Plaintiff a few months later, on August 21, 2018, he still had the hydrocele and swelling and pain at a 10/10 level, yet the only treatment Ndemanu provided was a scrotal support, which Plaintiff reported did nothing for him. (Doc. 58-2 at 5, 12.) Ndemanu asserts that because Plaintiff was already on pain medications, she did not

change his medication regimen, despite the fact that the current pain medication regimen was ineffective in treating Plaintiff's hydrocele pain. (Doc. 58, Ex. U, Ndemanu Decl. ¶ 10.)

Finally, at their last encounter on September 11, 2018, when Plaintiff reported increased and severe pain in his left scrotal sac, Ndemanu's treatment plan was only to "continue with hernia aid." (Doc. 58-2 at 20, 24.) Ndemanu suggests that she did not take any other action because she noted that the results of the ultrasound—that had been ordered by Dr. Ladele—"contained no comparison between the size of the left hydrocele from October 2017 and August 2018 (a size comparison had been requested)," and because the ultrasound results did not include any recommendation. (Doc. 58, Ex. U, Ndemanu Decl. ¶ 11.) But this purported note regarding that lack of size comparison is not in the medical records, and, regardless, the October 2017 and August 2018 ultrasound radiology reports both include the specific dimensions of the right and left scrotum/testis, so it is unclear why NP Ndemanu could not have reviewed those measurements in the two ultrasound reports to compare the size. (*See* Doc. 58-1 at 6, 107.) Nor is it clear why, if NP Ndemanu required a recommendation as to the proper course of treatment in light of the ultrasound results and Plaintiff's symptoms, she failed to submit a consult request for an appointment with a urologist—the appropriate specialist for Plaintiff's serious medical need. Instead, Ndemanu took no action and provided no treatment, despite Plaintiff's reports at the time of severe and increasing pain. (Doc. 85-2 at 20.) A reasonable jury could find that in these circumstances, NP Ndemanu's failure to do anything more than "monitor" and provide a scrotal strap constituted a failure to respond to Plaintiff's pain and medical need and amounted to deliberate indifference.

Defendants present no argument that Plaintiff did not suffer harm as a result of Ndemanu's deliberate indifference. The medical records show that from March to September 2018, when NP Ndemanu was Plaintiff's treating provider, Plaintiff suffered persistent swelling and worsening pain at 9/10 and 10/10 levels. (Doc. 58-1 at 89; Doc. 58-2 at 5, 20.) Plaintiff averred that by June 2018, his testicles were enlarged three times their

normal size and he had severe pain and discomfort, which interfered with his daily activities such as walking, sitting, showering, eating, and using the bathroom. (Doc. 4, Pl. Aff. ¶¶ 2, 5.) *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms). He further averred that the lack of treatment caused him to suffer distress and a fear of dying. (Doc. 4, Pl. Aff. ¶ 5.) Plaintiff's ongoing and severe pain could be found to constitute harm sufficient to support an Eighth Amendment claim. *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

Based on the above, summary judgment as to the claim against NP Ndemanu in Count One—related to treatment of the hydrocele—will be denied.

With respect to the Count Two claim related to the treatment of Parkinson's disease, the record shows that on May 1, 2018, Plaintiff reported tremors and cramping and history of Parkinson's symptoms, and in response, NP Ndemanu ordered labs. (Doc. 58-1 at 89, 91.) Following Plaintiff's July 2018 appointment with Dr. Aryal, NP Ndemanu prescribed the medication ordered by Dr. Aryal and submitted a consult request for the nerve conduction studies ordered by Dr. Aryal; however, NP Ndemanu failed to submit a consult request for the ordered one-month follow up. (Doc. 58-1 at 113; Doc. 58-2 at 2, 5, 12.) Even after Plaintiff saw NP Ndemanu again on September 11, 2018 and reminded her that he had been ordered to return to the neurologist after 30 days, she did not submit a consult request for the follow up or provide any treatment. (Doc. 58-2 at 20, 24.) Plaintiff did not see the neurologist for the follow up until five months later, in December 2018. (*Id.* at 64.) Failure to follow the recommendations of a treating specialist may constitute deliberate indifference. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical

officials who made decisions based on an administrative policy"); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs). Although NP Ndemanu followed through on some of Dr. Aryal's treatment orders, absent any explanation for the failure to comply with the ordered one-month follow up, a reasonable jury could find that that she made a conscious decision to ignore the specialist's recommendation, thereby displaying deliberate indifference to Plaintiff's serious medical need. And the record shows that during that four-month delay in seeing the neurologist for follow up, Plaintiff's Parkinson's symptoms increased, and he had worsening pain in his right side. (*See* Doc. 58-2 at 27, 52.) Thus, a jury could conclude that Plaintiff suffered harm as a result of NP Ndemanu's conduct. Accordingly, summary judgment will be denied to Ndemanu as to the claim in Count Two.

**VIII.   Corizon**

    **A.   *Monell* Claim**

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

. . . .

. . . .

## B.   Discussion

### 1.   Constitutional Injury

Defendants argue that Plaintiff has not shown that Corizon or its agents were deliberately indifferent to his medical needs and that evidence shows that he received continuous and ongoing neurology care to manage his Parkinson's, including imaging and nerve testing, and he receive bilateral hydrocelectomy surgery. (Doc. 57 at 14.) Defendants further argue that there is no evidence of a delay in treatment and, even if there was a mere delay in surgery or neurology care, Plaintiff has not shown that he suffered any harm. (*Id.*) Plaintiff counters that a 7-year delay in neurology appointments is not continuous care or a "mere delay," nor is failing to adequately treat a painful hydrocele for 2 years. (Doc. 69 at 5.) Plaintiff contends that his pain and suffering was "brushed off" by Corizon with ATPs and that Corizon's refusal to send him to specialists constituted deliberate indifference to his serious medical needs. (*Id.*)

Deliberate indifference is exhibited where a plaintiff demonstrates that medical staff chose a course of treatment that was "medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *see Jett*, 439 F.3d at 1097–98 (jury could find deliberate indifference where the prison doctor was aware that the plaintiff needed to see an orthopedist for treatment and the plaintiff was not taken to the orthopedist for 6 months). The Ninth Circuit and other courts have routinely found that failure to follow a treating specialist's or even a treating physician's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell*, 763 F.3d at 1069 (9th Cir. 2014); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones*, 193 F.3d at 490; *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012)

(in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation). In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n. 10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference).

Here, the medical evidence shows that numerous treating provider's consult requests for specialist care were repeatedly denied by Corizon. For example, the record shows that Dr. Elijah's March 2017 consult request for a neurology consult was denied by Corizon without explanation (Doc. 58-1 at 18); NP Ende's January 2018 consult request for a neurology consult was denied and an ATP was issued by Dr. Dorsey (*id.* at 69, 72); and NP Ende's January 2018 consult request for a urology consult was denied and an ATP was issued by an unknown Corizon administrator (*id.* at 74, 77). Dr. Dorsey is not identified, and there is no indication whether Dr. Dorsey is a specialist in urology, nor is there any evidence that Dr. Dorsey performed any type of examination of Plaintiff or review of Plaintiff's medical history and records before denying the treating provider's request for a urology appointment. And there is no evidence that the other consult requests were denied by a physician, much less a physician who examined Plaintiff and reviewed his medical records before denying the treating providers' requests for specialist care. *See Snow*, 681 F.3d at 988.

The record also shows that numerous treatment orders issued by the treating neurologist, Dr. Aryal, were simply ignored by Corizon. For example, on July 27, 2018, Dr. Aryal ordered that Plaintiff return for follow up in one month, but he did not return for follow up until five months later. (Doc. 58-1 at 113; Doc. 58-2 at 64.) Then at the December 2018 appointment, Dr. Aryal ordered that Plaintiff return for follow up in three months,

but he did not return for follow up until six months later, and that June 2019 appointment was scheduled only after the Court granted Plaintiff's request for injunctive relief and ordered Defendants to schedule the neurology appointment. (Doc. 58-2 at 66, 127; Doc. 44.) At that June 10, 2019 appointment, Dr. Aryal ordered that Plaintiff return for follow up in two months, but at the time Corizon ceased providing healthcare on July 1, 2019, the follow up neurology appointment had not been approved or scheduled. Dr. Aryal also ordered that Plaintiff stop taking Cymbalta and be issued a wheelchair. (Doc. 127 at 4; Doc. 56 at 1–2.) But Corizon continued to administer Cymbalta—via a watch-swallow method—throughout the time it remained the healthcare provider, and Plaintiff was not provided a wheelchair. (Doc. 65 at 2; Doc. 88-2 at 41, 51; Doc. 56 at 1–2.) In addition, on June 10, 2019, Dr. Aryal ordered that Plaintiff see a neurosurgeon; however, there is no evidence that this referral was made or that the neurosurgery appointment was scheduled before Corizon ceased providing healthcare on July 1, 2019. (Doc. 58-2 at 129).[12] Defendants present no explanation for the repeated delays in specialist-ordered follow-up treatment or for the failure to comply with the specialist's treatment orders. (*See* Doc. 57.)

Finally, the record shows that Corizon affirmatively rejected other specific treatment orders issued by the treating neurologist. Dr. Aryal's June 2019 order—and the treating provider's subsequent consult request—for Plaintiff to get a lumbar spine MRI was denied by Corizon's "S. Stacy" for the reason that it was not "medically necessary," yet there is no evidence that S. Stacy is a specialist or conducted any examination of Plaintiff or review of his medical records before determining that the procedure was not medically necessary and overriding the treating specialist's order. (Doc. 39 at 36.) Likewise, Dr. Aryal's June 2019 order—and the treating provider's subsequent consult

_____

[12] In their Motion, defense counsel asserts that Plaintiff has a pending appointment for neurosurgery; however, there is no citation to the record to support this assertion, and defense counsel's assertions are not evidence and are not considered. (Doc. 57 at 14.) *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 923 (9th Cir. 2001) ("arguments of counsel, however, are not evidence") (internal quotation marks and citation omitted); *Single Chip Systems Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1062 (S.D. Cal. 2007) ("this Court cannot consider factual evidence that [is] only proffered by counsel").

request—for Plaintiff to see a podiatrist was denied by S. Stacy based on the same vague determination that there was no "[m]edical necessity," absent any evidence that this determination was made by a specialist or based on a proper examination and consideration of Plaintiff's condition, current symptoms, and medical history. (Doc. 105 at 22.)

A reasonable jury could find that, by repeatedly denying and failing to comply with the treating providers' recommendations and treating specialists' orders, Corizon exhibited deliberate indifference to Plaintiff's serious medical needs.

In addition, a reasonable jury could conclude that Plaintiff suffered harm as a result of Corizon's deliberate indifference. Taking Plaintiff's facts as true, after the January 2018 consult request for a urology appointment was denied, Plaintiff suffered worsening and severe pain and progressive swelling that interfered with his daily activities. (Doc. 58-1 at 66, 72, 89; Doc. 58-2 at 20, 69; Doc. 4, Pl. Aff. ¶¶ 2, 5.) This suffering continued through December 2018, when Plaintiff finally saw a urologist pursuant to a court order, and until his February 2019 surgery. (Doc. 58-2 at 43, 50.) Also, during delays in neurology follow-up appointments and after denials of neurologist-recommended treatment and procedures, Plaintiff suffered severe and increasing pain in his hip, leg, ankle, and back; he suffered numbness; his right foot began to turn outward; and he had difficulty walking. (*See* Doc. 58-2 at 5, 19–20, 36–38, 52, 56, 58, 107; Doc. 56 at 18–19; Doc. 35.) Defendants suggest that this is harm attributable to Parkinson's disease rather than from any deliberate indifference by Corizon. (Doc. 57 at 14.) But pain and complications from Parkinson's can be treated or managed, for example, with medication and medical devices. Defendants present no evidence to show that regardless of any treatment interventions, Plaintiff would have suffered the same harm. Accordingly, there is a question of fact as to whether Plaintiff suffered a constitutional injury, and the first *Monell* element is satisfied.

### 2.   Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of

action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.*

Defendants assert generally that Plaintiff fails to show he was deprived of a constitutional right as a result of any policy of deliberate indifference and which was the moving force behind the violation. (Doc. 57 at 14.) Defendants contend that Plaintiff's Complaint did not even set forth an assertion that a policy, practice, or custom resulted in his injuries. (*Id.*)

To the extent that Defendants may argue that Plaintiff failed to state a policy claim against Corizon, the Court explicitly recognized such a claim in the Screening Order. (Doc. 8 at 6.) Further, in conjunction with his Complaint, Plaintiff filed a Motion for Preliminary Injunction, as well as a supporting memorandum and affidavit, in which he alleged that Defendants were refusing to treat his painful and enlarged testicle for over a year and they were repeatedly denying him access to a neurologist, and that these denials of care constituted an "ongoing and a continual violation." (Doc. 4, Pl. Aff. ¶¶ 2–4; Doc. 2 at 4.)

*See Erickson v. Pardus*, 5551 U.S. 89, 94 (2007) (a pro se litigant may " bolster[] his claim by making more specific allegations . . . in later filings"); *Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir. 2008) (district courts are required to afford a pro se litigant "'the benefit of any doubt' in ascertaining what claims he 'raised in his complaint and *argued to the district court*'"). Plaintiff also argued that he suffered harm as a result of Defendants' "persistent conduct," Defendants' refusal to follow physician orders, and Defendants' refusal to provide medical care "pursuant to their own policy." (Doc. 2 at 2; Doc. 3 at 3–4.)

The evidence submitted at summary judgment further supports the existence of a policy or custom. The medical evidence shows that Corizon and its medical staff repeatedly denied or failed to comply with specialist-recommended treatment and repeatedly denied treating providers' consult requests for specialist appointments and procedures. These multiple failures and denials and delays of medical care did not result from the actions of one or two rogue employees; rather, they occurred over time and involved numerous Corizon employees and officials. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation). A reasonable jury could conclude that given the frequency of denials of specialist-recommended treatment and consult requests over a two-year period, medical staff were acting pursuant to Corizon policy or custom. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### 3.    Deliberately Indifferent Policy/Moving Force

Because deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results, *see Wood*, 900 F.2d at 1334, an ongoing policy or practice that denies or delays treating specialist and physician-recommended treatment for a serious medical need and thereby causes harm would constitute a deliberately indifferent policy.

To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom

and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact whether there existed a policy or custom of denying or delaying treatment and procedures recommended by the treating specialists and physicians. An obvious consequence of such a policy or custom may be the denial and delay of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied. *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Accordingly, there exists a question of fact as to whether Corizon had a deliberately indifferent policy that deprived Plaintiff of his constitutional rights, and summary judgment will be denied as to the claims in Counts One and Two against Corizon.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 57), Plaintiff's Motion to Report Intentional Action (Doc. 94), Plaintiff's Motion for Urgent Medical Care (Doc. 65) and Plaintiff's Motion for Blatant Contemptuous Actions (Doc. 117).

(2)     Plaintiff's Motion for Urgent Medical Care (Doc. 65), Motion to Report Intentional Action to Cause Emotional and Physical Pain (Doc. 94) and Motion for Blatant Contemptuous Actions (Doc. 117) are **denied as moot**.

(3)     Defendants' Motion for Summary Judgment (Doc. 57) is **granted in part** and **denied in part** as follows:

(a)     the Motion is **granted** as to the claims against Nurse Myers and NP Ende, and these claims within Counts One and Two are dismissed with prejudice:

(b)     the Motion is otherwise **denied**.

(4)     Myers and Ende are dismissed as Defendants.

(5)     This action is referred to Magistrate Judge Michelle H. Burns to conduct a settlement conference. Defense counsel shall arrange for the relevant Parties to jointly call Magistrate Judge Burns' chambers at (602) 322-7610 within three weeks to schedule a date.

Dated this 20th day of March, 2020.

_____
Honorable John J. Tuchi
United States District Judge